UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| AMANDA M.[1], | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:20-cv-00046-JPH-MJD |
| | ) |
| ANDREW M. SAUL, | ) |
| | ) |
| Defendant. | ) |

**ENTRY REVIEWING THE COMMISSIONER'S DECISION**

Plaintiff Amanda M. seeks judicial review of the Social Security Administration's ("SSA's") decision denying her application for disability insurance benefits. She argues that the Administrative Law Judge ("ALJ") did not address whether her abnormal uterine bleeding and cervical dysplasia were "severe" and ignored important evidence for those conditions. For the reasons below, the decision is **REVERSED and REMANDED**.

**I.
Facts and Background**

In August 2017, Plaintiff applied for a period of disability and disability insurance benefits. Dkt. 7-2 at 12. She alleged that her disability began on

---

[1] To protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

1

January 7, 2016, and her date of last insured[2] was September 30, 2016.  *Id.*

The SSA denied her application initially and again on reconsideration.  *Id.*

ALJ Charles Thorbjornsen held a hearing in November 2018 and later denied Plaintiff's application for benefits.  *Id.* at 12, 18.  In his decision, the ALJ found that:

- At step one, Plaintiff had not engaged in "substantial gainful activity"[3] from her alleged onset date of January 7, 2016 through her date of last insured on September 30, 2016.  *Id.* at 14.

- At step two, Plaintiff had medically determinable impairments of "obese body habitus" and "a history of hernia repair," but these were not "severe" because they did not "significantly limit[] the ability to perform basic work-related activities for 12 consecutive months."  *Id.* at 14–15.

- Plaintiff was not disabled "at any time from January 7, 2016, the amended alleged onset date, through September 30, 2016, the date last insured."  *Id.* at 17.

The SSA's Appeal Council denied Plaintiff's request for review, *id.* at 1, and Plaintiff brought this action for review of the SSA's denial of benefits under 42 U.S.C. §§ 405(g).  Dkt. 1.

## II.
## Applicable Law

"The Social Security Act authorizes payment of disability insurance benefits . . . to individuals with disabilities."  *Barnhart v. Walton*, 535 U.S. 212,

---

[2] The "date of last insured" is "the last day for which she had acquired sufficient coverage during her work history to remain eligible for benefits." *Jones v. Saul*, 823 F. App'x 434, 436 (7th Cir. 2020); *see* 20 C.F.R. § 404.130; 42 U.S.C. §§ 413, 423.

[3] SSA regulations define "substantial gainful activity" as work activity that is both "substantial" ("involves doing significant physical or mental activities") and "gainful" ("usually done for pay or profit, whether or not a profit is realized").  20 C.F.R. § 404.1572.

214 (2002).  "The statutory definition of 'disability' has two parts."  *Id.* at 217.  First, it requires "an inability to engage in any substantial gainful activity."  *Id.*  And second, it requires a physical or mental impairment that explains the inability and "has lasted or can be expected to last . . . not less than 12 months."  *Id.*  "The standard for disability claims under the Social Security Act is stringent."  *Williams-Overstreet v. Astrue*, 364 F. App'x 271, 274 (7th Cir. 2010).  "Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful."  *Id.* at 274.

The ALJ must apply the five-step inquiry set forth in 20 C.F.R. § 404.1520(a)(4)(i)–(v), evaluating in sequence:

> (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (citation omitted).  "If a claimant satisfies steps one, two, and three, she will automatically be found disabled."  *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).  "If a claimant satisfies steps one and two, but not three, then she must satisfy step four."  *Id.*  "Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy."  *Id.*

After step three, but before step four, the ALJ must determine a claimant's RFC by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id.* The ALJ uses the RFC at step four to determine whether the claimant can perform her own past relevant work and, if not, at step five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 404.1520(e), (g). The burden of proof is on the claimant for steps one through four but shifts to the Commissioner at step five. *See Clifford*, 227 F.3d at 868.

When an applicant seeks judicial review of a benefits denial, courts will uphold an "ALJ's decision if it uses the correct legal standards, is supported by substantial evidence, and builds an accurate and logical bridge from the evidence to the ALJ's conclusion." *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020). Courts "review the entire record, but . . . do not replace the ALJ's judgment . . . by reconsidering facts, re-weighing or resolving conflicts in the evidence, or deciding questions of credibility." *Id.* A court's "review is limited also to the ALJ's rationales," meaning the Court cannot "uphold an ALJ's decision by giving it different ground to stand upon." *Id.* (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943)).

## III.
## Analysis

Plaintiff argues that the ALJ ignored evidence of her abnormal uterine bleeding and severe cervical dysplasia and thus did not build a logical bridge between the evidence and his step-two conclusion that she did not have a "severe" impairment. *See* dkt. 11 at 23–24. The Commissioner responds that substantial evidence supports the ALJ's decision and that Plaintiff did not provide evidence that she could not work during the eight-month period at issue. *See* dkt. 15 at 1–2.

"The Step 2 determination is a *de minimis* screening for groundless claims intended to exclude slight abnormalities that only minimally impact a claimant's basic activities." *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016) (citation omitted). "[I]f an individual's impairment does not appear from the objective medical evidence to be severe, the ALJ must then consider the limitations and restrictions caused by the individual's symptoms." *Curvin v. Colvin*, 778 F.3d 645, 649 (7th Cir. 2015). "If these additional considerations cause more than a minimal effect on an individual's ability to do basic work activities, the ALJ must find that the impairment[] is severe *and proceed to the next step in the process* even if the objective medical evidence would not in itself establish that the impairment[] is severe." *Id.* (emphasis in original).[4]

---

[4] The Seventh Circuit relied, in part, on SSR 96-3p in *Curvin*, but the SSA has rescinded SSR 96-3p as duplicative of another social security ruling. *See* 83 Fed. Reg. 27816 (June 14, 2018) (stating that SSR 96-3p was "unnecessarily duplicative of SSR 16-3p"). Neither party argues that SSR 96-3p's rescission alters the step-two determination.

Here, at step two, the ALJ found that Plaintiff had "medically determinable impairments" of "an obese body habitus, and a history of hernia repair." Dkt. 7-2 at 14. The ALJ concluded that:

> Through the date last insured, the claimant did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant did not have a severe impairment or combination of impairments (20 CFR 404.1521 *et seq.*).

*Id.* at 15. The ALJ did not discuss Plaintiff's bleeding specifically but noted that Plaintiff "was treated for uterine issues." *Id.* at 16–17. The ALJ discounted the severity of these "uterine issues," however, citing medical records that Plaintiff was in "no painful distress" and that "the associated records found no musculoskeletal issues, or neurologic/focal loss."[5] *Id.* at 16–17. But the Plaintiff's medical records reveal other symptoms that the ALJ did not address. *See O'Connor-Spinner*, 832 F.3d at 697 (ALJ cannot "cherry-pick[] evidence supporting his finding while ignoring contradictory information.").

Plaintiff saw Dr. Patel, a family medicine physician, on January 7, 2016 and reported that she had experienced "bleeding about 20 to 25 days a month" that sometimes involved clots, and she said that this had been "[o]ngoing for [the] last several years." Dkt. 7-4 at 29–31. Dr. Patel referred Plaintiff to see OB/Gyn Dr. Myers. *See id.* at 31, 79.

At a February 26 exam with Dr. Myers, Plaintiff reported "abnormal bleeding for 7 years," which was "worse in the past 3 years" with "nonstop"

---

[5] The ALJ did not explain how these findings on musculoskeletal or neurologic conditions affect the severity of Plaintiffs' abnormal uterine bleeding or cervical dysplasia. *See* dkt. 11 at 27.

bleeding and, on some days, "clots the size of tennis balls." *Id.* at 79. On those days, "she saturate[d] jumbo pads 4–5 times daily and ha[d] ruined clothing and bedding." *Id.* Plaintiff also reported a history of polycystic ovary syndrome and that she had tried several medications "to no avail." *Id.*; *see* dkt. 11 at 6. Dr. Myers performed a pap smear and scheduled an ultrasound for March 11. Dkt. 7-4 at 80; dkt. 11 at 6.

On March 21, 2016, Dr. Myers met with Plaintiff to discuss test results. Dkt. 7-4 at 78. The pap smear showed "ASCUS" (atypical squamous cells of undetermined significance), and the ultrasound "showed evidence of [a] large endometrial polyp," which Dr. Myers thought was "the main reason for her bleeding problems." *Id.*; *see* dkt. 11 at 7.

On April 12, 2016, Dr. Myers performed a diagnostic hysteroscopy, polypectomy, and dilation and curettage" ("D&C"). Dkt. 7-3 at 58–64; dkt. 7-4 at 75. During this procedure, he removed "a large endometrial polyp" from her uterus. Dkt. 7-3 at 62.

On April 28, 2016, Plaintiff saw Dr. Myers for a surgical follow-up, and Plaintiff said she was "doing well" and "had no recent bleeding." Dkt. 7-4 at 76. Dr. Myers thought the "abnormal bleeding was caused by the polyp" that he removed, so he recommended "conservative" management. *Id.*

On September 6, 2016, Plaintiff visited the ER for "vaginal bleeding" that started "1.5 months" before her visit. Dkt. 7-3 at 84. Before her visit, she had "passed about 7 clots" in the previous four hours. *Id.* An ultrasound performed at this visit revealed "[t]hickened echogenic endometrium possibly

7

due to endometrial blood products" and a "right ovarian cyst." *Id.* at 89. After receiving morphine and fluids, she was discharged and prescribed medication to take until her follow-up with Dr. Myers. *Id.* at 87, 90, 113.

On September 13, 2016, Plaintiff explained to Dr. Myers that she had "bled for more than 30 days and [wa]s passing big clots." Dkt. 7-4 at 75. Dr. Myers reported that Plaintiff's prescribed medication had "not halted her bleeding," so he recommended "a hysteroscopy with Novasure for endometrial ablation," which he scheduled for October 11, 2016. *Id.*; dkt. 7-3 at 77.

On September 15, 2016, Plaintiff visited the ER for "a lot of vag[inal] bleeding and pain." Dkt. 7-3 at 77. Her bleeding had "significantly increased" over the previous 24 hours. *Id.* She reported that she went "through 4 pads every h[our]" and suffered from "associated light headedness, dizziness, nausea, numbness in [her] left leg, waxing and waning pain that radiate[d] from the cervix to the upper abdomen (rated 10/10)," shortness of breath, and "chest pain secondary to cervix pain." *Id.* An "external inspection" of her "pelvic" area appeared "[n]ormal," there was "no cervical motion tenderness," and a "[m]oderate amount of blood [was] in the vaginal vault" with "no active bleeding," "abnormal discharge," or "adnexal tenderness or masses." *Id.* at 79. After an ultrasound, Dr. Mark Arvin discovered a "4 cm complex cyst of the right ovary." *Id.* at 82. Plaintiff was discharged with instructions to take prescribed medication and ibuprofen until her procedure on October 11 and to follow-up with Dr. Myers in 2–3 days. *Id.* at 82, 106.

On October 11, 2016,[6] Dr. Myers performed a "[d]iagnostic hysteroscopy with NovaSure ablation" and removed endometrial tissue. Dkt. 7-4 at 87–88. At a follow-up visit on October 25, Plaintiff reported that her bleeding had stopped but that "sharp pelvic pain" ran "up thr[ough] her vagina, to her uterus area, and a bit to the right of midline" and had increased since the procedure. *Id.* at 73. On November 3, 2016, Dr. Myers performed a colposcopy on Ms. Mitchell and diagnosed her with "cervical dysplasia." *Id.*

Plaintiff had several follow-up appointments with Dr. Myers, *see id.* at 71, and in February 2017, Dr. Myers performed a surgery called "cold knife conization," which involves removing a cone-shaped piece of cervical tissues containing abnormal cells, *see id.* at 68–70; dkt. 11 at 25. Dr. Myers diagnosed Plaintiff with "[s]evere dysplasia of cervix." Dkt. 7-4 at 69.

At the hearing before the ALJ in November 2018, Plaintiff testified that her severe bleeding "started before [she] even quit working" and that the "profuse[]" bleeding "made for a lot of clothes changes" and for her to "have to go home." Dkt. 7-2 at 36. She said that she had to leave her work shift "a lot" to change clothes, "to the point where they had [her] bringing clothes and stash[ing] them in the back" until "it got to the point where there was no just changing" because "a full shower was required." *Id.* at 42. She also had to "call out" of work because the "cramping was so bad" and that made her job

---

[6] This event is relevant even though it occurred after Plaintiff's last insured date. *See Parker v. Astrue*, 597 F.3d 920, 924–25 (7th Cir. 2010). In determining whether a "plaintiff was totally disabled by" "the last date before her coverage expired," the ALJ must "consider *all* relevant evidence, including the evidence regarding the plaintiff's condition" past the date of last insured. *See id.* (emphasis in original).

9

"hard to do." *Id.* at 36. She also spoke with her boss about her condition in April 2016, and he asked her "to take a break due to [her] frequent asking off for the surgeries and things at the time and calling in." *Id.* at 36, 41–42; *see Arnold v. Saul*, No. 20-2067, 2021 WL 925558, at *2 (7th Cir. Mar. 11, 2021) (asking whether a claimant's conditions "actually impacted her ability to work").

    The ALJ did not cite any of this evidence. Instead, the ALJ relied on a note from a general surgeon who repaired Plaintiff's hernia in October 2015 stating that Plaintiff "is released to go back to work now and may resume normal activities with no restrictions." Dkt. 7-2 at 17 (referencing dkt. 7-3 at 158–59). But the surgeon made that note in a follow-up appointment for Plaintiff's hernia repair, and it does not address Plaintiff's other health issues, including her abnormal uterine bleeding or cervical dysplasia. *See id.*; dkt. 16 at 3. The ALJ also pointed to "benign" and "[un]remarkable" records from Plaintiff's visits in March and August 2016 with Dr. Patel, a family practitioner, stating that she was not in "distress." Dkt. 7-2 at 16–17 (referencing dkt. 7-4 at 21–29). But those records also do not disclose whether Dr. Patel addressed Plaintiff's abnormal uterine bleeding or cervical dysplasia. *See id.*; dkt. 16 at 3–4. Regardless, the required question at step two is not whether a claimant is in "distress." It's whether a condition causes "slight abnormalities that only minimally impact a claimant's basic activities." *O'Connor-Spinner*, 832 F.3d at 697. Given the uncited evidence of Plaintiff's abnormal uterine bleeding and cervical dysplasia and the effects these conditions played on her work, Plaintiff

10

has shown "more than a minimal effect on [her] ability to do basic work activities." *Curvin*, 778 F.3d at 649. The ALJ therefore "must . . . proceed to the next step in the process." *Id.*

The Commissioner argues that Plaintiff has not "prov[en]" that "the condition would prevent her from performing work" and that Plaintiff has offered "no medical opinion attesting . . . that she would be prevented from working." Dkt. 15 at 10. But the Commissioner cites no authority requiring a claimant to provide a medical opinion stating that she "would be prevented from working" at step two. *See id.*; *cf. O'Connor-Spinner*, 832 F.3d at 697 ("The Step 2 determination is a *de minimis* screening for groundless claims . . . ."). A condition need not be independently disabling at step two; it need only "cause more than a minimal effect on . . . basic work activities" before the ALJ must continue with the remaining steps of the analysis. *See Curvin*, 778 F.3d at 649. Plaintiff's medical evidence meets that standard.

Because the ALJ ignored evidence and did not address why Plaintiff's uterine bleeding and cervical dysplasia were not "severe" at step two, he failed to "fully explore the restrictions cause[d] by" these conditions in the remaining steps of the analysis. *O'Connor-Spinner*, 832 F.3d at 698–99. That requires remand. *See id.*

11

## IV.
## Conclusion

For the reasons above, the decision is **REVERSED and REMANDED**.

Final judgment will issue in a separate entry.

**SO ORDERED.**

Date: 3/31/2021

*James Patrick Hanlon*

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Matthew Frederick Richter
KELLER & KELLER LLP
mrichter@2keller.com

Christie O'Brien Tate
SOCIAL SECURITY ADMINISTRATION
christie.tate@ssa.gov

Joseph R. Wambach
KELLER & KELLER
joew@2keller.com

Julian Clifford Wierenga
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
julian.wierenga@usdoj.gov